The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the United States Court of Appeals for the Fourth Circuit are admonished to draw nine and give their attention. The Court is now sitting. God save the United States and this Honorable Court. All right. Thank you. Be seated. We're fortunate to have with us today Judge Ellen Hollander, United States District Judge from Maryland, sitting for the first time on the Fourth Circuit. Glad to have you here. Thank you. Hope you go away with a favorable impression. Absolutely. Okay. Let's hear from the appellant in the first case. Good morning, Chief Judge Traxler, Judge Thacker, and Judge Hollander. May it please the Court. My name is Tom Ploufton. I'm from Loudoun County, Virginia, and I represent Carly Ahlstrom in the matter before you today. I'm going to presume that the Court obviously has read the briefs and the facts, and so I'd like to address the issues that we've put forward, and I'm going to do that temporarily because I don't want to make a presumption as to what the Court deems most important. The first issue that we want to address is whether or not there was a proper stop and whether or not there should have been a suppression of all evidence based on the lack of reasonable articulable suspicion from the office or that any violation of traffic laws had occurred. In this particular case, we believe that the Court abused its discretion in finding that there was reasonable articulable suspicion because the statute is very clear, is that one does not have a violation of a tag light unless one cannot see it from a distance of within 50 feet, and there was no evidence provided by the government that the officer had a view of anything within 50 feet. Didn't he testify that he saw in his mirror as the car was passing him? Well, he did testify, but that was, I think, the crux of it, that there's an inference there of, but we don't know how far away the car was width-wise, and we also know, and the judge took judicial notice of the fact that the speed limit at the time of what he estimated the speed to be was that the car was traveling 70 feet a second, and so there's nothing to connect the fact that I look in my mirror, was it more than one second, 1,001, it's already beyond 50 feet, and the government had the burden of establishing that threshold issue. They didn't ask the question, was it within 50 feet, can you give an estimate of the distance it was in your mirror? Well, his testimony was as the car was passing him. Well, he said as it had passed, he looked in his rear-view mirror. So as it passed, but in the 1,001, it's already 70 feet. That's the evidence of the case, and the judge took judicial notice. Well, for reasonable articulable suspicion, if the court's the fact-finder, doesn't that testimony give rise to an inference that the car was traveling in the opposite direction that the police vehicle was facing, and that if his testimony is he saw the car as it was passing, that that's within 50 feet. Why couldn't the court draw that inference? Well, I don't think that the court can assume facts, Your Honor, and I just think that the issue in this case is that the government had the burden of establishing one of the elements, which was 50 feet. They could have asked a question in terms of the distance and so forth of what was the width, how far away was it behind you, was it more than two car lengths, three car lengths, less than that, and so forth, and all of a sudden it opens up for guessing in that particular case. We do know that afterwards, when he said that he was within 50 feet and so forth, he wasn't able to make a determination of whether the tag light was working because his own headlights had illuminated the tag. Moving on to the next issue, if I may, I think that the next two issues are, I'd ask the court to be guided, and I know that you're not bound by it, but I think Judge Urbanski in the Western District wrote a wonderful opinion that I would like to distinguish on two areas in the Foster case, and because it's a strikingly similar case with regard to the facts in this case, and the issue is whether or not under the regulation the breath certificate should have been admitted into evidence, and then the second issue is even if it was admitted, was there error in granting it any weight? The issue, as the court is well aware, in 36 CFR 4.23C4, there is a requirement that any test shall be conducted using accepted scientific methods and equipment of proven accuracy and reliability, and it's the second category that I'd like to focus on today. I'm not going to discuss accepted scientific methods at this point, but the proven accuracy and reliability, and the issue that I'd like the court to consider in this case is that when Judge Urbanski addressed it in his opinion in the Foster case, he talked about admissibility with respect to the rule of evidence 9.01 and authenticity, and I would ask the court to consider that those are not the only elements for admissibility. You have the admissibility evidence under the rules, but you also have other issues. Something could be not admissible because it's not relevant, and in this case we believe that the regulation creates another element of admissibility. Would you say that again? I didn't follow what you said. I think that the regulation contains or establishes an element for admissibility of the test itself, and that by saying that the test shall be conducted by using accepted scientific methods and equipment of proven accuracy and reliability, then in terms of being able to as evidence that would be material and relevant in this particular case, it seems to me that a precursor to considering that evidence is that one has to have proven accuracy and reliability on the particular machine before you admit the certificate. And that's not defined anywhere, is that right? It is not defined, but when we look at it historically, what has happened is that they usually bring in a certificate of the person who maintains the machine, and in this case we don't have to get into the issue of Bull Cumming or Melendez-Diaz as to whether that needed to be a face-to-face confrontation because the government did not establish that certificate's admissibility even to overcome a hearsay objection, so that there is no certificate as to the reliability of the machine at all. So then what we have at best is a statement and attestation on a preprinted form by the officer that said it was allegedly tested within 90 days, but as Judge Urbanski, when he allowed the test in, we're suggesting that was perhaps, we'd ask you to consider that he went further than he needed to go in that particular case, but even if, and I'm going to assume making that argument that that was an element to go forward, even if it's admitted, there should have been no weight given to it because that preprinted statement by the officer saying it was tested within 90 days doesn't say anything about the accuracy on the 6th of January or the 16th of January when this incident, 6th of January when this incident took place. But the officer testified about the accuracy on the date of the incident when he did the self-test and it determined there were no problems. Well, actually, Judge Thacker, that was interesting. What he testified to is that he followed his training, but then when I asked him, is there any way that you can, what if the machine itself isn't working or that diagnostic isn't working, he said, well, it won't, the machine won't work. And he didn't say he knew that from his experience. He said that was what he was trained and that would be the machine itself. And I think that that distinction between experience and how one is trained, meaning that they have actual knowledge versus what they're told by somebody else, was an important distinction that Judge Urbanski brought forward as to why he couldn't give it any weight to that. In the Foster case, Judge Urbanski was dealing with an officer that was the first time he had used the machine. This officer, in this case, testified he'd used it hundreds of times. Isn't that an important distinction? I really don't think so, only because what that then assumes is that we have an infallible machine and machines don't wear out, machines don't make, don't have any issues. If that's the case, we would never need to have a requirement that they have further in the regulations that you have to have the machine recertified every 90 days and so forth. And more importantly in this case, there's a difference, I don't want to, between being a pushing certain buttons and being able to ascertain or attest to the reliability of the machine. And I specifically asked on direct, across examination, do you have any familiarity with the algorithms in the machine? Are you responsible at all with the maintenance of the machine? Do you have any knowledge of how it's done? And his response, it was found in page 91 and 92 of the joint appendix, his response in that case is that, no, I don't, and that this is how I'm trained, and because I'm trained in this regard, I'm told that the machine won't operate if it's not operating properly, but there's no personal information that he has in his own right. How about tell me what, in your opinion, would satisfy you, satisfy the statute? What testimony would, in your opinion, be required to satisfy? I think the first thing you would need is, I think that the court would need for it to come in under the per se statute. Don't say it come in, tell me, who would testify to what? I think that the government would have to produce evidence of the certificate that says that it was accurate and it had been properly tested in accordance with that. That would give evidence for the court to realize since that didn't come in, then the officer could have testified if he had observed it being tested, if he had observed, if he had any familiarity that he had compared. All officers would have to come watch the person test it every time it's tested to be able to testify they saw it tested. No, Chief Judge Traxler, I think that you're not trying to be put into that bright line. You asked me what would be required. Absent a certificate, I think that you have to have somebody with some knowledge that it was accurate and had some basis other than just being told it's accurate by somebody else, whether they had tested it themselves, not just a blank test and pushed a button and it came forward. That's the whole purpose of why, in most cases, we rely on this certificate of accuracy, which didn't come in in this case. It does say in the exhibit, this was Government Exhibit 1, that the instrument was certified as accurate within the past 90 days. And what's interesting about that, though, is that, and that's why I focused on it being a preprinted form, Judge Hollander, is that it was a preprinted form and it says that, but then when I tested the officer's ability to make that attestation, and I asked him, do you have anything to do with the maintenance? Do you have anything to do with it? Do you know anything about the algorithm? Can you provide any testimony to support that attestation? He could not, only that that's what he was trained, and he was trained that the machine wouldn't operate if it wasn't operating properly. And then I asked the question, well, what if the algorithm that tells it not to operate wasn't working, and he couldn't go beyond that? Now, I anticipate that the government is going to say, very much along those lines, Judge Hollander, that that's the pivotal bright line rule. There's an attestation and it says it was tested within 90 days, and that's what I'd like this court to consider as well, because Judge Urbanski, in his distinction on some of the cases, he referenced the Christie case, and he said that one of the things that was different in his particular case was there was no such attestation that it had been tested within the last 90 days. However, that was in a paragraph, in his opinion, where he talked about six other factors that he had to consider as to whether there should be any weight given to the certificate. And so I don't think that, and I think the government is essentially, in their brief, is arguing that there should be a bright line rule, that as long as the attestations clause says that there's something tested within 90 days, we don't care what the officer says afterwards. We don't care if he doesn't have any authority, because we're going to rely on this attestation, of which we believe we've established there was no factual basis for in that regard. I think that that sums up my arguments on this first half, unless the court has any additional questions at this point. Okay, thank you. You've got some time reserved. Thank you. We hear from the government. Good morning. May it please the court, my name is Stacey Bogert, and I'm appearing today on behalf of the United States in this case. Before the court are two issues on appeal. First is whether there was sufficient evidence concerning the reliability of the testing equipment to convict the defendant of driving while intoxicated, and the second issue is whether the court properly denied the defendant's motion to suppress evidence following the traffic stop. Each of the defendant's argument is entirely without merit. I'll address first the question of whether the evidence was sufficient to convict the defendant of driving while intoxicated. First, contrary to defendant's assertions, the court properly concluded that there was sufficient evidence to convict the defendant of driving while intoxicated. This is a very straightforward case. On January 6, 2012, at approximately 2.45 in the morning, the defendant was driving down the George Washington Memorial Parkway. Let's get right to these legal issues. The issue is the record contains ample evidence concerning the reliability of the equipment that was used on the night in question, and there's no evidence in the record that the equipment was not functioning properly. First, we have the testimony of the arresting officer. It's not his burden to show that it wasn't operating properly. His position is it's your burden. That's correct, Your Honor. We do have first the testimony of the arresting officer. Officer Gillespie testified first. He testified that the intoxicator had been certified and inspected at the time of the test. So we have his testimony, not just the Exhibit 1, his testimony that was not objected to, that the intoxicator was certified, it was inspected at the time of the test. It's on page 71 of the joint appendix. The officer testified that he was a certified operator of the intoxicator with experience conducting hundreds of intoxicator tests. The officer testified that the intoxicator would disable itself in the event of a malfunction. He testified he did not observe any evidence on the night in question that there was anything that the intoxicator was malfunctioning. And he also testified that had there been something wrong with the intoxicator, it would disable itself during the self-testing. In addition to the officer's testimony, there's also the test results themselves admitted as Exhibit 1. Let's go back to your statement about the officer's testimony that it had been about the certification. You referred to what he said on direct, but on cross-examination, he was asked how he knew about its having been tested for its accuracy or calibration, and he had no evidence, he said, with him that day. And when asked how he knew, he said he knew because he had seen it in other trials. He had seen the certification. So would that be sufficient to establish the accuracy? Is that your argument? Your Honor, I would submit that the officer's statement that the intoxicator had been certified and inspected would be sufficient to establish reliability. But you don't need to rely on just that statement. There's evidence that goes way beyond that. So not just his testimony that the machine was certified and accurate. You have the test results themselves. They reflect that the instrument had been certified on November 14, 2011. That's just a form, isn't it? Well, it's a printout from the machine, the intoxicator equipment, and it does reflect the certification date. It also has the attestation clause at the bottom of the Exhibit 1 that reflects that the intoxicator had been certified within the past 90 days. The attestation clause also states that the intoxicator equipment that was used had been approved by the NHTCSA as conforming to model specifications for evidential breath alcohol measurement devices. In addition to the fact that the attestation clause says that it had been certified as accurate within the past 90 days by a United States Park Police technician who was certified by the instrument manufacturer to calibrate and conduct accuracy checks with the instrument. So in sum, the record contains significant evidence demonstrating that the equipment was reliable and accurate. Furthermore, the intoxicator results are completely consistent with the defendant's behavior on January 6. When the defendant's vehicle approached the officer, the defendant slammed on her brakes. The officer then, after observing that the taillight did not appear to be in compliance with Virginia law, followed the defendant who was weaving within her lane of traffic. The officer activated his emergency lights, used his horn, and the defendant continued driving down the parkway. When the defendant eventually stopped her car, the officer observed that she was only partially dressed. There was clothing and underwear strewn about the car. The defendant admitted that she hadn't stopped her car because she didn't have any clothing on. The officer observed that the defendant's eyes were red and glassy. The officer observed that the defendant smelled like alcohol. The defendant failed two of her three roadside sobriety tests. And finally, she admitted that she knew she should not have been driving, but she did so anyway. What are these facts? How do they relate to the issues in this case? The issue is a question of whether the intoxicator was, there's evidence sufficient to support the conviction, and whether the evidence is sufficient to show that the intoxicator was functioning accurately on the night in question. She had been drinking. The machine says she'd been drinking. That means the machine was working properly. No, the evidence in the record demonstrates that the machine was certified and accurate. I point to the other factors of her driving behavior just to show that her driving behavior indicates also that she was drinking. It further suggests that the results of the intoxicator and the fact that they're consistent with her behavior. Essentially, in spite of all this evidence showing that the defendant was driving while intoxicated, the defendant now argues that her conviction should be overturned. And she contends that even though the record contains evidence that the machine was certified as accurate in November 2011, and the officer testified that the machine was certified and inspected, and that the certification was conducted by a United States Park Police technician, she argues that's not good enough, that there needs to be something more, and that unless the government can present a separate sheet of paper, a separate certificate of accuracy, then there can be no conviction. In support of this argument, the defendant relies exclusively on cases out of the Western District of Virginia, United States v. Foster. But Foster is clearly distinguishable from the current case for several reasons. First, the Foster court specifically noted itself that the test results in that case contained no attestation clause or anything about whether the equipment had been tested for accuracy and was working properly at the time of the test. But here, Exhibit 1, the defendant's test results, they specifically include an attestation clause that was signed by Officer Gillespie stating that the instrument is certified as accurate within the past 90 days. And the Exhibit 1 also includes the certification date and the certification expiration date. The second way that this case is distinguishable from the Foster case is that in Foster, the officer had no independent knowledge of the accuracy machine, and here Officer Gillespie provided testimony regarding the intoximeter that was used. The officer testified that at the time of the test, the equipment was certified and inspected. The officer testified that there was no indication of anything wrong with equipment. And he also testified that he knew the equipment had been properly calibrated because he'd seen the certification in connection with other trials. And the third way that this case is distinguishable from Foster, as Your Honor pointed out, is in Foster, it was the officer's first time conducting a breathalyzer test or using the equipment. And by contrast, Officer Gillespie testified that he was a certified operator of the intoximeter with experience conducting hundreds of tests. So the government would submit that here the evidence is ample to show that the equipment was functioning properly on the night in question and the evidence supports the defendant's conviction for driving while intoxicated. The second issue, which is whether the court properly denied the defendant's motion to suppress evidence following the traffic stop, also without merit, it's well-settled that a police officer may conduct an investigatory stop of a vehicle if the officer has a reasonable suspicion of illegal activity. Here the officer stopped the defendant's vehicle based on a reasonable suspicion that the defendant had violated a state traffic provision requiring the vehicle to have a taillight or other light illuminating the license plate. And the officer articulated specific facts in support of this reasonable suspicion. First, he testified that when the defendant's vehicle approached his vehicle, she slammed on the brakes and the car visibly dipped down. This caused him to notice the vehicle. And after the defendant's car passed the officer, he looked in a side-view mirror and could not see the vehicle's tag or license plate. The officer testified that in his experience, if a taillight had been functioning properly, he should have been able to see the vehicle's tag when it passed, and he could not. After the officer was following the defendant, he testified that there was also a time, this is the second instance, when he could not see the taillight. What was the evidence that he couldn't see the taillight within 50 feet? The officer did not testify to what distance it was, whether he was less than 50 feet or more than 50 feet. Here, if you view the evidence in the light most favorable to the government, I think the court credited the officer's testimony in reaching a conclusion that the officer had articulated a reasonable suspicion. I'd also note that regardless of whether ultimately the testimony established that the defendant had violated the provision, the fact that the officer noted when the car passed that he couldn't see the taillight, in his experience, if the taillight was functioning, you should be able to see it from where he was located. That supports a reasonable suspicion. Ultimately, she wasn't convicted, and there was no evidence supporting all the elements of the claim, but the standard here, the burden on the government to prove their case beyond a reasonable doubt to support a conviction is very different than whether the officer had a reasonable suspicion that would justify pulling the car over. And that's really what the defendant's trying to do here. The defendant's arguing that because there's no evidence that the car was within 50 feet and the government hasn't met its burden, but the burden for reasonable suspicion is much lower. It's not establishing every element of the offense and proving those elements beyond a reasonable doubt. It's enough that the officer was able to articulate a specific reason why he believed that the defendant had violated a traffic provision, and here the officer observed twice that the defendant's vehicle did not appear to be properly illuminated, once when the vehicle first passed him and then later when he was following the vehicle, and that's enough to support a reasonable suspicion to stop the vehicle. Accordingly, the court did not err in crediting the officer's testimony and denying the defendant's motion to suppress the evidence obtained after the traffic stop. Thank you. Okay. Reply. Thank you again. May it please the Court. Just addressing in reverse order the issue on the traffic stop in itself, I'd like to just address that by analogy. The courts have often said that an officer's hunch of somebody beating is not sufficient, that it has to be connected to some notion of distance traveled over a period of time to formulate reasonable articulable suspicion, and in this case we're just arguing that I don't think you have reasonable articulable suspicion that he thinks he should have seen it without connecting it to the statute itself, and that there's no evidence of it being 50 feet, and that's all I really wanted to say with regard to that. I thought it was interesting listening to the government's case because what they wanted to talk about, it seemed to me, was was there evidence of somebody driving under the influence and not what was the element or the issue that Ms. Ahlstrom was actually convicted of, which was having a blood alcohol level above a .08. Now, interestingly, she was charged with both, and Magistrate Jones at that time decided to find a .08 and dismiss the other charge, and he did so administratively in that case. So the issue here is not her behavior or whatever else. It's whether or not there's a scientific liability that you could find over a .08, and I know I've relied on Judge Urbanski's, I think, very thoroughly researched 18-page opinion in that. One of the things he concludes is that when you don't have sufficient reliability, the most he can come up with is that at best the weight he could give it is that the report would show a presence of alcohol but nothing to go above a .08, and then Judge Urbanski in the Foster case actually went forward and then did an analysis of the field test and so forth to make a determination of whether he could find not under the per se statute but whether or not he could find under the influence of alcohol. We don't have that in this case. This is a reliance of whether it was a .08 or higher with no indicia that there is an accurate result. Judge Hollander, I want to address the one question you had raised as well, is the fact that the officer said, had he seen it in other trials? Well, the problem is that there is nothing of what he had seen in other trials. Nothing was fleshed out by the government. We certainly didn't want to address any hearsay that we couldn't bring up and actually ask him what did he see and where is the document and so forth. So there's nothing there for the court to rely on as to whether there was any foundation that had any teeth to it. And then when you contrast to the fact that he doesn't know anything about the algorithms, he doesn't know anything about the maintenance, and that this was all part of his training, I don't think that that is sufficient to allow for a determination of reliability in this case. That's what I have to say. Thank you very much for your time this morning. Thank you. We'll come down and agree counsel and then we'll go into our next case.
judges: William B. Traxler Jr., Stephanie D. Thacker, Ellen L. Hollander